UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHNNIE EDWARDS,

        Petitioner,

                                CASE NO. 2:08-CV-12874

v.                             JUDGE VICTORIA A. ROBERTS
                                MAGISTRATE JUDGE PAUL J. KOMIVES

NICK J. LUDWICK,

        Respondent.[1]

_____/

## REPORT AND RECOMMENDATION

*Table of Contents*

I.     RECOMMENDATION ................................................................. 2
II.    REPORT ......................................................................... 2
    A.    *Procedural History* ....................................................... 2
    B.    *Factual Background Underlying Petitioner's Conviction* .............................. 4
    C.    *Standard of Review* ....................................................... 8
    D.    *Ineffective Assistance of Counsel (Claim I)* ...................................... 10
        1.    *Clearly Established Law* ................................................ 11
        2.    *Analysis* ........................................................... 11
            a. Failure to Object to Hearsay and Irrelevant Testimony ...................... 12
            b. Failure to Object to Petitioner's Statement ............................... 14
            c. Failure to Order DNA Testing ....................................... 17
            d. Failure to Request Self-Defense Instruction ............................. 18
    E.    *Right to Present a Defense (Claim II)* ........................................ 19
        1.    *Clearly Established Law* ................................................ 19
        2.    *Analysis* ........................................................... 21
    F.    *Prosecutorial Misconduct (Claim III)* ......................................... 22
        1.    *Clearly Established Law* ................................................ 23
        2.    *Analysis* ........................................................... 23
    G.    *Sentencing (Claim IV)* ..................................................... 24
        1.    *Guidelines Scoring* .................................................... 25
        2.    *Blakely* ............................................................ 25
    H.    *Recommendation Regarding Certificate of Appealability* ............................ 29
        1.    *Legal Standard* ...................................................... 29
        2.    *Analysis* ........................................................... 31
    I.    *Conclusion* .............................................................. 32
III.   NOTICE TO PARTIES REGARDING OBJECTIONS ...................................... 32

---

[1]By Order entered this date, Nick J. Ludwick has been substituted in place of Percy Conerly as the proper respondent in this action.

I.    RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus.  If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

II.   REPORT:

A.    *Procedural History*

1.    Petitioner Johnnie Edwards is a state prisoner, currently confined at the Mid-Michigan Correctional Facility in St. Louis, Michigan.

2.    On September 20, 2005, petitioner was convicted of assault with intent to do great bodily harm less than murder, MICH. COMP. LAWS § 750.84, following a jury trial in the Ingham County Circuit Court.  On October 19, 2005, he was sentenced as an habitual offender, second offense, MICH. COMP. LAWS § 769.10, to a term of 7-15 years' imprisonment.

3.    Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

   I.    DEFENDANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL THROUGH COUNSEL'S CUMULATIVE ERRORS THAT [WERE] PREJUDICIAL TO DEFENDANT.

        A.    INADMISSIBLE HEARSAY ADMITTED WITHOUT OBJECTION.

        B.    FAILURE TO OBJECT ON SELF-INCRIMINATION GROUNDS.

        C.    FAILURE TO OBJECT TO IRRELEVANT TESTIMONY.

        D.    FAILURE TO ORDER DNA TESTING OF EVIDENCE.

        E.    FAILURE TO REQUEST SELF-DEFENSE INSTRUCTION.

   II.   DEFENDANT WAS DENIED HIS RIGHT TO PRESENT A DEFENSE AND HIS RIGHT TO COMPULSORY PROCESS BY THE TRIAL COURT'S DENIAL OF HIS REQUEST FOR AN ADJOURNMENT TO

PRODUCE THREE CRUCIAL WITNESSES. US CONST AM VI, XIV; MICH CONST ART 1, SEC 17, 20.

III. THE PROSECUTOR DEPRIVED DEFENDANT OF HIS STATE AND FEDERAL CONSTITUTIONAL DUE PROCESS RIGHTS TO A FAIR TRIAL WHEN HIS IMPROPER ARGUMENT SHIFTED THE BURDEN OF PROOF FROM THE PROSECUTION TO DEFENDANT.

IV. DEFENDANT IS ENTITLED TO RESENTENCING WHEN THE STATUTORY SENTENCING GUIDELINES WERE MISSCORED AS TO THE OFFENSE VARIABLES, WHICH AFFECTED THE SENTENCING GUIDELINE RANGE.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Edwards*, No. 266207, 2007 WL 1094666 (Mich. Ct. App. Apr. 12, 2007) (per curiam).

4. Petitioner, proceeding *pro se*, sought leave to appeal these issues to the Michigan Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Edwards*, 479 Mich. 868, 735 N.W.2d 273 (2007).

5. Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on July 7, 2008. As grounds for the writ of habeas corpus, he raises the claims that he raised in the state courts.[2]

6. Respondent filed his answer on March 4, 2009. He contends that petitioner's sentencing claim is not cognizable on habeas review, that the prosecutorial misconduct claim is barred by petitioner's procedural default in the state courts, and that the remaining claims are without merit.

---

[2]In addition to the five ineffective assistance of counsel claims raised by petitioner in the state courts, petitioner's habeas application raises five additional ineffective assistance of counsel claims. After respondent filed an answer seeking dismissal of the petition based on petitioner's failure to exhaust these claims, petitioner filed a motion to delete the unexhausted ineffective assistance claims and to proceed on the exhausted claims. The Court granted that motion on February 2, 2009.

7.     Petitioner filed a combined reply to respondent's answer and motion for evidentiary hearing on April 6, 2009.

B.     *Factual Background Underlying Petitioner's Conviction*

Petitioner's conviction arises from the April 4, 2005, assault of Deborah Johnson. The evidence adduced at trial was accurately summarized in the prosecutor's brief on appeal in the Michigan Court of Appeals:

> Johnson testified at trial that she and Defendant had dated for two years (Tr II, p 51), and that he had been violent toward her in the past (Tr II, p 53). Johnson described the relationship as marked by arguing, jealousy and possessiveness on the part of Defendant (Tr II, p 53).
>
> On the weekend of April 2 and 3, 2005, Johnson informed Defendant that she wanted to end the relationship (Tr II, p 53). Defendant did not take the news well and he wanted to continue the relationship (Tr II, p 54).
>
> On the night of April 3, 2005, Johnson was driving in her car when she saw Defendant. Defendant immediately called her on her cellular telephone and asked her to stop and talk (Tr II, p 53). Johnson drove away without stopping to talk because she was afraid of what Defendant might do to her (Tr II, p 53).
>
> Around 1:00 a.m. on April 4, Defendant telephoned Johnson at her home (Tr II, p 54). Defendant begged Johnson to come to his home (Tr II, p 55). She repeatedly told him "no" because she was afraid to be alone with him (Tr II, p 55). Defendant eventually told Johnson he was hungry and did not have food to eat (Tr II, p 55). Defendant also promised Johnson he would not harm her (Tr II, p 55). Johnson eventually relented and delivered food to Defendant (Tr II, p 55).
>
> Shortly after Johnson arrived at Defendant's home, he began yelling at her and calling her a "slut," "whore," "bitch," and "cheater" because he believed that she had been unfaithful to him (Tr II, p 57). Defendant ordered Johnson to return the jewelry he had given her. Johnson removed the jewelry and gave it to Defendant (Tr II, p 58). Johnson sat on the couch in Defendant's living room. Defendant went to the kitchen and came back with a large knife (Tr II, pp 59-60). Defendant put the knife against Johnson's throat and yelled at her that she was a "bitch" and a "cheater" (Tr II, p 60). At that moment, Defendant's father looked out from his bedroom and Defendant told him to "mind your own business" as he jabbed the knife into the wall (Tr II, p 60). His father returned to his bedroom and did not come out again while Johnson was present (Tr II, p 60).[1] Johnson cried and Defendant told her, "bitch, don't nobody care bout you crying." (Tr II, p 62).

[1]Defendant's father died before trial.

Johnson was scared and told Defendant she would not leave him with the hope he would not harm her (Tr II, p 61-62). Defendant nonetheless continued to yell at her (Tr II, p 62). At one point, Defendant told Johnson, "Do you think I should spare your life because you have kids?" (Tr II, p 67). Eventually, Johnson told Defendant, "just do it then" (Tr II, p 62). Johnson grabbed the knife and tried unsuccessfully to pull it away from Defendant (Tr II, p 62). Defendant then threw the knife to the side and started choking Johnson with his hands (Tr II, p 62). He also punched her in the face several times with his fists (Tr II, p 62). He then jammed his knee on her throat for a short time, threw her on the floor and continued choking her (Tr II, p 64). She thought he was going to kill her (Tr II, p 64).

Defendant returned his knee to Johnson's throat and placed his hand over her mouth (Tr II, p 65). She could not breathe (Tr II, p 65). When she tried to fight him off, he choked her more (Tr II, p 65). At one point, Defendant rolled Johnson onto her stomach and pulled her head back by the hair (Tr II, p 65). He then turned her over onto her back and continued to choke her (Tr II, p 65). Johnson went unconscious (Tr II, p 65). She regained consciousness when Defendant threw water on her (Tr II, p 65). However, he again choked her and she again became unconscious (Tr II, pp 67-68). After she regained consciousness, Defendant told her to read the Bible to him and find a scripture that would convince him not to "finish" her (Tr II, p 70). Johnson read the Bible to Defendant and he eventually fell asleep on the floor (Tr II, p 70).

After Defendant fell asleep, Johnson went to the kitchen and ran water to see if that would wake him (Tr II, p 71). She also used a wet wash cloth to wipe the blood from her face (Tr II, p 73).[2] When Defendant did not awaken, Johnson grabbed her keys and cellular telephone and left the house (Tr II, p 71). She left behind her sweater, shoes and purse because she was too scared to spend time looking for them (Tr II, p 72). Johnson left in her car and used her cellular telephone to call her father. She was choked up from the trauma of the experience, had trouble breathing, and eventually stopped her car and vomited into the street (Tr II, p 73). When she reached her parents' home, her father called for an ambulance which transported her to the hospital emergency room (Tr II, p 75).

[2]A wash cloth, with what appeared to be blood on it, was found by the police (Tr I, p 69; Tr II, p 73).

Officer Rachel Ball interviewed the victim at the hospital (Tr I, p 58). She found the victim lying in a bed, with a collar around her neck, and apparently unable to move (Tr I, p 58). The victim spoke so softly that Ball had to lean over the victim's face to hear her (Tr I, p 58). Ball's testimony regarding her interview of the victim was essentially consistent with the victim's trial testimony (Tr I, pp 62-90).

After interviewing the victim, Ofc. Ball drove to Defendant's home. There, she noticed the living room was in disarray consistent with a struggle (Tr I, pp 68-69). Ball found a wet wash cloth on the couch and it appeared to have blood on it (Tr I, p 69). Ball interviewed Defendant and he stated that the victim came to his

home that night and accused him of cheating on her (Tr I, p 68). Defendant told Ball that they had a heated argument and that the victim pushed him (Tr I, p 68). He told Ball that he did not touch the victim or assault her in any way (Tr I, p 68). He admitted to Ball, however, that the victim did not have any injuries before coming to his home that night (Tr I, p 68). Ball arrested Defendant for the assault. She noticed what appeared to be blood on his pants (Tr I, p 68). Defendant told Ball that the substance was "paint" (Tr I, p73).

The victim's mother, Helen Johnson, testified that when her daughter arrived at her house that night her face was swollen and her mouth was bleeding (Tr III, p 5). The whites of the victim's eyes were red (Tr III, p 6). According to Helen, the victim missed two weeks work because of her injuries (Tr III, p 6).

The victim's father, Eddie Johnson, testified that when the victim called him on the telephone she said that Defendant had "really beat her up this time" (Tr III, p 11). He noticed that her eyes were bloodshot, her face was swollen, there was a bruise on her chest, she was limping and crying (Tr III, p 11).

Desiree Kato, the program coordinator for the Capital Area Response Effort (CARE), testified that her organization provides advocacy for victims of domestic violence (Tr III, p 15). Included in their services are court assistance, safety counseling, liaison with police and the prosecutor's office and referrals to other organizations that provide services to victims (Tr III, p 16). Kato testified that victim's are strangled in 40 percent of the domestic violence cases handled by CARE (Tr III, p 17). Kato testified that being strangled is "very traumatic" for the victim and that the victim's memory of the event may come back slowly (Tr III, p 18). Kato stated that it is not uncommon for a victim of domestic assault to stay in the relationship with the assailant (Tr III, p 19). She noted that domestic assault is really about "power and control" over the victim (Tr III, p 19). With regard to the present case, Kato stated that she took the victim to a local photography shop that photographs victims of domestic assault as a free service in order to document their injuries (Tr III, p 25). Kato noted that the victim had bruises that continued to develop over time and that her voice was very hoarse (Tr III, pp 20, 22).

Detective Traci Ruiz testified that she met with the victim on April 8, 2005 (four days after the assault). Ruiz at that time noticed that the victim's eyes were "blood red" and that her voice was "very raspy" (Tr III, pp 29-30).[3] She did not notice bruising around the victim's neck (Tr III, p 42).

[3]Ruiz recorded the victim's raspy voice on April 15, 2005 and the tape was played for the jury (Tr III, p 31).

Emergency room doctor Douglas Segan testified that he treated the victim on April 4, 2005 (Tr II, p 16). The victim reported pain in her face, neck, chest, and left shoulder (Tr II, p 17). Dr. Segan noted the victim had bruises on her scalp, face, left ribs, left shoulder, left elbow and left wrist and that the whites of her eyes were red from hemorrhaging (Tr II, pp 19-20). He ordered CAT scans of the victim's brain and facial bones, and x-rays of her neck, ribs, shoulder, elbow and wrist (Tr II, p 18).

Dr. Segan stated that he has treated dozens of patients who have been strangled (Tr II, p 8-9). He testified that death or permanent injury can occur within minutes due to brain damage from lack of oxygen (Tr II, p 13). He noted that the victim's eye hemorrhages could have been caused by strangling or a blow to the eyes (Tr II, pp 21, 25). Dr. Segan and the intake nurse did not note a problem with the victim's speech at the time she was brought to the hospital (Tr II, p 27).

Paramedic Jason Sarata testified that he transported the victim to the hospital. The victim informed him that she had been assaulted by her boyfriend and that he had choked her with his knee (Tr II, p 41).

At the close of the prosecution's case, Defendant moved for a directed verdict (Tr III, p 45). The trial court denied the motion (Tr III, pp 45-46).

Tonya Terry testified that she met Defendant four days before the alleged assault (Tr III, p 48). Terry testified that on April 4, 2005 she was at Defendant's home and Defendant showed her his caller ID (Tr III, p 50). There were 25 to 30 calls from a telephone number that Defendant identified as belonging to "Deb", who he described as his fiancé (Tr III, pp 50-51). Terry and Defendant went for a walk and when they returned, Defendant's father informed Defendant that his fiancé had called again (Tr III, p 52). Later, Defendant accepted another telephone call that Terry believed was from Defendant's fiancé (Tr III, p 54).

Defendant testified that his use of drugs had put a strain on his relationship with the victim (Tr III, p 62). Defendant also stated that the victim accused him many times of cheating with other women (Tr III, p 63). Defendant testified that on April 3, 2005, the victim telephoned him "several" times (Tr III, p 63). After his walk with Tonya Terry, they returned to his home and the victim called again (Tr III, pp 64-65). Terry then left his home and he began to drink alcohol (Tr III, p 66). He talked to the victim on the telephone later that night and she brought him food (Tr III, p 66). They talked in his living room and he told the victim to return the jewelry he had given her (Tr III, pp 68, 70). The victim threw a ring on the floor and gave him the rest of the jewelry which she was wearing (Tr III, p 70). Defendant testified that the victim then asked, "Who's the new bitch?" (Tr III, p 71). Defendant told the victim to "hit the door" (Tr III, p 71). Defendant walked into the kitchen and the victim followed him (Tr III, p 72). Defendant told the victim to leave and the victim asked Defendant to return the food she bought him (Tr III, p 72). Defendant refused. The victim opened the refrigerator door and Defendant closed it (Tr III, p 72). According to Defendant, the victim then struck him in the back of the head (Tr III, p 72). He then grabbed her and headed toward the front door (Tr III, p 73). It was at that point that his father looked out and asked what was happening (Tr III, p 73). Defendant told his father "this bitch is out of here" (Tr III, p 73).

According to Defendant, the victim told him to let her go (Tr III, p 74). Defendant released the victim and she punched him in the neck (Tr III, p 74). Defendant grabbed the victim and they fell to the floor (Tr III, p 74). He tried to pull her toward the door. They both got to their feet and the victim charged him (Tr III, p 76). Defendant back-handed her (Tr III, p 76). They fell together on the couch (Tr III, p 78). The victim kicked over the table (Tr III, 78). They rolled on the floor and

Defendant pinned her down (Tr III, pp 78-79). Defendant also punched her twice with his fist and hit her twice with his open hand (Tr III, p 80).

The victim told Defendant that she could not breathe (Tr III, p 81). Defendant testified that he thought she was faking (Tr III, p 81). Defendant again told the victim to get out (Tr III, p 81). The victim tried to stand and fell on her face (Tr III, p 82). Defendant again thought she was faking and then threw water on her (Tr III, p 82). The victim did not move and she made a "snorting" sound (Tr III, p 83). Defendant testified he then became scared and he "blew in her mouth" while she was unconscious (Tr III, p 83). He ran to the kitchen to get water and wiped her face with it (Tr III, p 83). The victim did not move and she made a "snoring" sound (Tr III, p 84). Defendant testified he grabbed the victim under the arms and tried to pull her toward the door, but he could not move her (Tr III, p 84). He testified he then held her and she gasped and shook (Tr III, pp 85-86). He descried her eyes as glassed over and said there was drool running from her mouth (Tr III, p 86). Defendant claimed the victim said to him, "I'm sorry baby." (Tr III, p 86). Defendant testified he then said to her "Get the hell out of my house." (Tr III, p 86). Defendant testified he then fell asleep and awoke to the police banging on his door (Tr III, p 86). When he awoke, the victim was gone (Tr III, p 86).

Defendant testified he did not choke the victim, nor did he tell her he was going to kill her (Tr III, p 87). He also testified he did not hold a knife to the victim (Tr III, p 88). He also denied having told the victim to get a Bible and read from it (Tr III, p 91). He did admit that he drank a beer, a half-pint of alcohol and had a drink at his brother's home before the incident with the victim (Tr III, p 96).

Pl.-Appellee's Br. on Appeal, in *People v. Edwards*, No. 266207 (Mich. Ct. App.), at 1-8.

C.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States; or

        (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the

holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.      *Ineffective Assistance of Counsel (Claim I)*

Petitioner first contends that his trial counsel rendered constitutionally ineffective assistance at trial. Specifically, he contends that counsel was ineffective for failing to: (1) object to hearsay evidence; (2) object to his incriminatory statements; (3) object to irrelevant testimony; (4) order DNA testing; and (5) request a self-defense instruction. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

The Sixth Amendment right to counsel and the corollary right to effective assistance of counsel protect the fundamental right to a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense. *Id.* at 687. These two components are mixed questions of law and fact. *See id.* at 698. Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*

With respect to the performance prong of the inquiry, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id.* at 689; *O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994). "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted). "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. With respect to the prejudice prong, the reviewing court must determine, based on the totality of the evidence before the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

2. *Analysis*

a. *Failure to Object to Hearsay and Irrelevant Testimony*

11

Petitioner first contends that counsel was ineffective for failing to object to the hearsay testimony of Officer Rachel Ball recounting the statements made to her by the victim, as well as irrelevant testimony of Desiree Kato regarding the Capital Area Response Effort and the characteristics of domestic abuse victims. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

With respect to the victim's hearsay statements to the Officer Ball, the Michigan Court of Appeals agreed that the statements were hearsay, and that counsel was therefore ineffective in failing to object to the statements. However, the court of appeals concluded that petitioner could not establish that he was prejudiced by counsel's failure to object, because the victim's statements to Officer Ball were cumulative of the victim's testimony at trial and were in large part corroborated by petitioner's own testimony at trial. *See Edwards*, 2007 WL 1094666, at *1, slip op. at 1-2. The Court should conclude that this determination was reasonable.

At trial, Officer Ball testified regarding the victim's statement to her shortly after the assault. In the statement, the victim indicated that she and petitioner had a former dating relationship, and that on the evening of the assault petitioner had contacted her. In response to petitioner's pleas to talk about their relationship, she went to petitioner's house at about 2:00 a.m. He immediately became upset with her, and started yelling at her and calling her names. Petitioner grabbed a knife and continued yelling at her. Petitioner's father came out of his own room, turned around, and left. Petitioner swung the knife, striking the wall. The victim went to the living room and sat down on a couch. Petitioner came up to her and repeatedly struck her with his fist across her face. He then put both hands over her throat and squeezed. At one point, he took his knee and laid it across her neck. She lost consciousness several times. Petitioner eventually laid down and fell asleep, at

which time she went to the kitchen and turned the water on. She washed her face with a washcloth, and when petitioner did not awaken to the sound of the running water, she left the house and called her mother on the phone. *See* Trial Tr., dated 9/16/05, at 62-65. This statement was virtually identical to, although less detailed than, the victim's testimony at trial. *See id.*, dated 9/19/05, at 51-75. Further, as observed by the court of appeals, many aspects of the victim's statement to Officer Ball and testimony at trial were corroborated by petitioner's own testimony. In these circumstances, petitioner cannot show that he was prejudiced by counsel's failure to object to Officer Ball's testimony regarding the victim's hearsay statements. *See Chestnut v. McDonough,* 199 Fed. Appx. 853, 854-55 (11th Cir. 2006); *Adams v. Smith,* 280 F. Supp. 2d 704, 721 (E.D. Mich. 2003) (Tarnow, J.); *cf. United States v. Gabe*, 237 F.3d 954, 958-59 (8th Cir. 2001) (admission of hearsay accusation harmless where evidence was cumulative to victim's trial testimony).

With respect to the testimony of Desiree Kato, the Michigan Court of Appeals expressly held that this testimony was admissible as a matter of state law. *See Edwards*, 2007 WL 1094666, at *2, slip op. at 2-3. In analyzing petitioner's ineffective assistance of counsel claim, this expression of state law is binding on this Court. *See Basile v. Bowersox*, 125 F. Supp. 2d 930, 960 (E.D. Mo. 1999). *See generally*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Sarausad v. Porter*, 503 F.3d 822, 824 (9th Cir. 2007) ("A determination of state law by a state appellate court is . . . binding in a federal habeas action."). Thus, any objection by counsel would have been futile. Counsel cannot be deemed ineffective for failing to raise a meritless objection. *See Bradley v. Birkett*, 192 Fed. Appx. 468, 475 (6th Cir. 2006); *Anderson v. Goeke*, 44 F.3d 675, 680 (8th Cir. 1995); *Burnett v. Collins*, 982 F.2d 922, 929 (5th Cir. 1993). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on these claims.

*b.  Failure to Object to Petitioner's Statement*

Petitioner next contends that counsel was ineffective for failing to object to his statements to Officer Ball and to the prosecutor's questioning of him regarding his version of events on Fifth Amendment grounds.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

Petitioner first contends that counsel should have objected to Officer Ball's testimony regarding his statements to her on the night of the assault when she interviewed him at his house. He argues that these statements were elicited from him in violation of his Fifth Amendment privilege against self-incrimination.  The Michigan Court of Appeals rejected this claim, reasoning that the statements occurred prior to arrest and were not induced by the *Miranda* warnings, and thus that their admission did not violate petitioner's Fifth Amendment rights.  *See Edwards*, 2007 WL 1094666, at *1, slip op. at 2.  The Court should conclude that this determination was reasonable.

The Fifth Amendment provides, in relevant part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]"  U.S. CONST. amend. V.  This provision applies to the states via the Due Process Clause of the Fourteenth Amendment.  *Malloy v. Hogan*, 378 U.S. 1, 6 (1964).  The Supreme Court has determined that this provision "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt."  *Griffin v. California*, 380 U.S. 609, 615 (1965).  Likewise, "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial."  *Doyle v. Ohio*, 426 U.S. 610, 618 (1976).  Nevertheless, the Court's subsequent cases have made clear that *Griffin* and *Doyle* are limited to situations in which the defendant's silence was induced by the governmental assurances embodied in the

*Miranda* warnings. *See Fletcher v. Weir*, 455 U.S. 603, 606 (1982) (per curiam) (post-arrest statements made before *Miranda* warnings are given may be commented upon by prosecutor, noting that the Court has "consistently explained *Doyle* as a case where the government had induced silence by implicitly assuring the defendant that his silence would not be used against him."); *Jenkins v. Anderson*, 447 U.S. 231, 240 (1980) (pre-arrest silence may be used for impeachment because "no governmental action induced [the defendant] to remain silent before arrest.").

Here, there is nothing to indicate that petitioner's statements to Officer Ball were made while he was in custody or were induced by the *Miranda* warnings. On the contrary, the evidence at trial established that Officer Ball interviewed petitioner in his own home, and that he was not placed under arrest until after the interview terminated. It is true that several courts of appeals, including the Sixth Circuit, have held that it violates the Fifth Amendment to use a defendant's pre-arrest silence as substantive evidence of guilt. *See Combs v. Coyle*, 205 F.3d 269, 283 (6th Cir. 2003). However, this is a question on which the courts are equally divided, *see id.* at 282, and, more importantly for purposes of § 2254(d)(1), the Supreme Court has never held that the use as substantive evidence of a defendant's pre-arrest silence not induced by the *Miranda* warnings violates the Fifth Amendment. On the contrary, the Court in *Jenkins* explicitly declined to "consider whether or under what circumstances prearrest silence may be protected by the Fifth Amendment." *Jenkins*, 447 U.S. at 236 n.2; *see also*, *Portuondo v. Agard*, 529 U.S. 61, 70 (2000) (noting *Jenkins* Court's observation that "it was not clear whether the Fifth Amendment protects pre-arrest silence."). As the Supreme Court has explained on several occasions, "it is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1419

(2009) (internal quotation omitted); *accord Wright v. Van Patten*, 128 S. Ct. 743, 747 (2008). Thus,

> [t]he Supreme Court's failure to rule on this issue, coupled with the "disagreement and confusion" among the federal courts concerning the resolution of this issue, precludes this court from finding that the Michigan Court of Appeals' decision was an unreasonable application of clearly established federal law, where clearly established Supreme Court precedent on the issue of using prearrest silence as substantive evidence of guilt did not, and does not, exist.

*Mitchell v. Lafler*, No. 02-CV-74805, 2003 WL 21817616, at *4 (E.D. Mich. July 10, 2003) (Cohn, J.) (citing *Worden v. McLemore*, 200 F. Supp. 2d 746, 752-53 (E.D. Mich. 2002)), *aff'd*, 118 Fed. Appx. 24, 27 (6th Cir. 2004); *see also*, *Jones v. Trombley*, 307 Fed. Appx. 931, 934 (6th Cir. 2009). And it follows that, because Michigan follows the rule that pre-arrest silence not induced by *Miranda* warnings is admissible, any objection by counsel would have been futile. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

Petitioner also contends that counsel was ineffective for failing to object to the prosecutor's questions during cross-examination. Upon cross-examination of petitioner, the prosecutor asked petitioner why, in telling Officer Ball his version of events, he did not tell the version that he testified to at trial. *See* Trial Tr., dated 9/20/05, at 97-98. This claim fails, for several reasons. In *United States v. Robinson*, 485 U.S. 25 (1988), the Court held that the *Griffin* prohibition on comment by the prosecutor does not apply "where . . . the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel[.]" *Robinson*, 485 U.S. at 32; *see also, United States v. Hasting*, 461 U.S. 499, 515 (1983) (Stevens, J., concurring) ("But I do not believe the protective shield of the Fifth Amendment should be converted into a sword that cuts back on the area of legitimate comment by the prosecutor on the weaknesses in the defense case."). Similarly, in *Fletcher*, *supra*, the Court limited *Doyle* to situations in which the defendant's silence was induced by the governmental assurances embodied in the *Miranda*

warnings. Where such warnings have not yet been give, it does not "violate[] due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand." *Fletcher*, 455 U.S. at 607. Here, both *Robinson* and *Fletcher* bar petitioner's claim. At petitioner's initial interview with the investigating officer, he was not placed under arrest and was not given the *Miranda* warnings. Thus, under *Fletcher* the prosecutor was free to impeach petitioner's story with his failure to relate it to the investigating officer at the first opportunity. Further, under *Robinson*, the prosecutor's comments and questions were a permissible response to the defense asserted by petitioner at trial.

In addition, petitioner was not questioned regarding his failure to make a statement to Officer Ball, but on the inconsistencies between the statement he did give and his testimony at trial. The *Doyle* rule does not apply where the accused actually speaks with the police. "Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all." *Anderson v. Charles*, 447 U.S. 404, 408 (1980). For these reasons, the prosecutor's questioning of petitioner was not improper, and counsel was therefore not ineffective in failing to object. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c. Failure to Order DNA Testing

Petitioner next contends that counsel was ineffective for failing to insist that the police subject the stain on his pants, which Officer Ball testified looked like blood and which he claimed was paint, to DNA testing. The Michigan Court of Appeals rejected this claim, explaining that

> insisting that the police perform DNA testing in this case would have been
> unreasonable. The investigating officer testified that she did not submit the jeans for

> DNA testing because it is expensive, time consuming and unnecessary for the investigation of this case given that the victim was the only person to have suffered injury that night. Moreover, defendant admitted that he assaulted the victim. Thus, it was large immaterial whether the substance on defendant's jeans was the victim's blood[.]

*Edwards*, 2007 WL 1094666, at *2, slip op. at 3. This determination was reasonable.

As explained by the court of appeals, whether the substance on petitioner's pants was blood was irrelevant at trial. Both petitioner and the victim testified that there was a verbal and physical altercation, and petitioner admitted to striking the victim. There was no question of identity, only whose version of events to believe and whether that version satisfied the elements of the crime charged. Whether or not there was blood on petitioner's pants did not tend to give more credence to either version of events, as both versions included petitioner hitting the victim. Petitioner has offered no argument as to how definitive evidence regarding the presence or absence of the victim's blood on his pants could have affected the jury's verdict. Thus, petitioner has failed to establish that counsel was ineffective, and he is not entitled to habeas relief on this claim.

### d. Failure to Request Self-Defense Instruction

Finally, petitioner contends that counsel was ineffective for failing to request an instruction on self-defense. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

The Michigan Court of Appeals rejected this claim, concluding that a self-defense instruction was not warranted under state law. The court explained that petitioner's own testimony established that he pinned the victim to the floor, sat on her, and repeatedly punched her. *See Edwards*, 2007 WL 1094666, at *3, slip op. at 3. Based on this testimony the court reasoned that

> [e]ven accepting defendant's testimony that the victim was the initial aggressor as true, defendant cannot assert self-defense because he used excessive force to repel

18

the attack he claims was mounted by the victim. Indeed, defendant did not try to merely subdue the victim, but rather backhanded her, punched her in the face, and sat on her until she was unconscious. This far exceeds the force necessary to defend himself. Because the evidence did not support a self-defense instruction, trial counsel was not ineffective for failing to request such an instruction.

*Id.*

In analyzing petitioner's ineffective assistance of counsel claims, this expression of state law is binding on this Court. *See Basile v. Bowersox*, 125 F. Supp. 2d 930, 960 (E.D. Mo. 1999). *See generally*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Sarausad v. Porter*, 503 F.3d 822, 824 (9th Cir. 2007) ("A determination of state law by a state appellate court is . . . binding in a federal habeas action."). Counsel cannot be deemed ineffective for failing to request an instruction which was not appropriate under state law. *See Mitzel v. Tate*, 267 F.3d 524, 538 (6th Cir. 2001). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E.      *Right to Present a Defense (Claim II)*

Petitioner next contends that he was denied a fair trial by the trial court's denial of a continuance to secure the attendance of three witnesses who had been subpoenaed but who had not appeared at court. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.      *Clearly Established Law*

Although the Constitution does not explicitly provide a criminal defendant with the right to "present a defense," the Sixth Amendment provides a defendant with the right to process to obtain witnesses in his favor and to confront the witnesses against him, and the Fourteenth Amendment guarantees a defendant due process of law. Implicit in these provisions is the right to present a meaningful defense. As the Supreme Court has recognized, "[t]he right to offer the testimony of

witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense." *Washington v. Texas*, 388 U.S. 14, 19 (1967). "The right to compel a witness' presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness' testimony heard by the trier of fact. The right to offer testimony is thus grounded in the Sixth Amendment." *Taylor v. Illinois*, 484 U.S. 400, 409 (1988). Further, the Court has noted that "[t]his right is a fundamental element of due process of law," *Washington*, 388 U.S. at 19, and that "[f]ew rights are more fundamental[.]" *Taylor*, 484 U.S. at 408. Although the right to present a defense is fundamental, it is not absolute. Thus, the right must yield to other constitutional rights, *see e.g.*, *United States v. Trejo-Zambrano*, 582 F.2d 460, 464 (9th Cir. 1978) ("The Sixth Amendment right of an accused to compulsory process to secure attendance of a witness does not include the right to compel the witness to waive his Fifth Amendment privilege."), or to other legitimate demands of the criminal justice system, *see United States v. Scheffer*, 523 U.S. 303, 308 (1998).

To constitute a denial of the right to present a defense, a trial court's exclusion of evidence must "infringe[] upon a weighty interest of the accused." *United States v. Scheffer*, 523 U.S. 303, 308 (1998). A "weighty interest of the accused" is infringed where "the exclusion of evidence seriously undermined 'fundamental elements of the defendant's defense' against the crime charged." *Miskel v. Karnes*, 397 F.3d 446, 455 (6th Cir. 2005) (quoting *Scheffer*, 523 U.S. at 315). Thus, "'[w]hether the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends upon whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006) (quoting *Washington v. Schriver*, 255 F.3d 45, 47 (2d Cir. 2001)) (alterations by quoting

court). In other words, application of the rules of evidence constitute a denial of the right to present a defense only where it "significantly undermine[s] fundamental elements of the accused's defense," *Scheffer*, 523 U.S. at 315–that is, where the application of the evidentiary rules "infringe[s] upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308.

2.  *Analysis*

On the second day of trial, counsel sought an adjournment to present locate and present the testimony of three witnesses who had been subpoenaed. Counsel made an offer of proof regarding these witnesses. According to counsel, Shalmor Griffin, petitioner's niece, would testify that the victim told her that no other non-relative women were allowed to come to the house, substantiating petitioner's claim that the victim was jealous. Cassandra Jones, the victim's daughter, would testify that contrary to her testimony the victim actually lived in petitioner's house, and also would testify as to the volatile nature of the relationship. Finally, an Eaton County Family Independence Agency worker would testify that the victim listed petitioner's address as her home address on an FIA form, corroborating the testimony of petitioner's daughter. *See* Trial Tr., dated 9/20/05, at 103-04. The trial court found that a continuance was not warranted because the information was not relevant and, to the extent relevant, was cumulative of evidence already presented. Specifically, the court noted that whether or not the victim lived at the residence was irrelevant. Further, the victim's jealousy was irrelevant in light of the fact that the prosecution is not required to prove motive. And, the court explained, any testimony regarding the volatile nature of the relationship was cumulative, because the testimony of both the victim and petitioner established the nature of the relationship. *See id*. at 109-11. The Michigan Court of Appeal rejected petitioner's claim that he was denied his right to present a defense, concluding that because "none of the witnesses' testimony would have revealed

new or otherwise relevant facts about the assault, the victim's relationship with defendant, or the victim's credibility," petitioner was not denied his right to present a defense. *Edwards*, 2007 WL 1094666, at *3, slip op. at 4. The Court should conclude that this determination was reasonable.

Here, the inability of petitioner to present these three witnesses did not undermine a fundamental element of his defense in that it would have provided a reasonable doubt which did not otherwise exist. As explained by the Michigan courts, whether the victim was living at petitioner's home at the time was irrelevant to the charges against him, and it had already been established that the victim used petitioner's home as a mailing address. Thus, the testimony of petitioner's daughter and the FIA worker was irrelevant and cumulative. Further, the testimony of petitioner's daughter that the relationship between petitioner and the victim was volatile was well established by the testimony of both petitioner and the victim, and thus would have been cumulative. Finally, the testimony of petitioner's niece that the victim was jealous and had prohibited women from coming to petitioner's home was irrelevant to whether petitioner assaulted the victim with the intent to do her great bodily harm, particularly in light of the Michigan Court of Appeals's conclusion that even petitioner's version of events did not support a self-defense instruction. Because this evidence was either irrelevant or cumulative, the exclusion of the evidence did not deprive petitioner of his right to present a defense. *See Blanton v. Elo*, 186 F.3d 712, 715-16 (6th Cir. 1999) (no denial of right to present defense were excluded evidence was cumulative). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.      *Prosecutorial Misconduct (Claim III)*

In his third claim, petitioner contends that he was denied a fair trial by improper statements made by the prosecutor during closing argument. The Court should conclude that petitioner is not

entitled to habeas relief on this claim.

1. *Clearly Established Law*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id*. (internal quotation omitted). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). In determining whether the prosecutor's conduct was so egregious as to warrant habeas relief, a court should consider "the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury; and the strength of the competent proof to establish the guilt of the accused." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations and citations omitted). In sum, to constitute a denial of due process the prosecutor's conduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Id*. (internal quotation omitted).

2. *Analysis*

Petitioner contends that he was denied a fair trial by the prosecutor's comment, during closing argument, that petitioner had "every reason not to tell you the truth because he's on trial." Trial Tr., dated 9/20/05, at 121. The Michigan Court of Appeals rejected petitioner's claim, concluding that the comment did not burden petitioner's right not to testify nor did it suggest that petitioner had the burden to disprove any element of the offense. *See Edwards*, 2007 WL 1094666, at *4, slip op. at 5. The Court should conclude that this determination was reasonable.

Viewed in context, it is clear that the prosecutor's comment neither suggested that petitioner was obligated to come forward with any evidence nor had the burden to disprove any element of the offense. Rather, the prosecutor's comment was a fair statement on petitioner's motivations to testify truthfully, and was immediately followed by a thorough discussion of the inconsistencies in petitioner's testimony. *See* Trial Tr., dated 9/20/05, at 122-23. And because petitioner testified at trial, the prosecutor was free to comment on his testimony. While it is true that a criminal defendant has no duty to testify or come forward with any evidence, once he does so a prosecutor is permitted to comment on that evidence. Here, the prosecutor's comments were merely "a proper way of arguing that the [petitioner's] argument was mere speculation unsupported by the evidence." *United States v. MMR Corp.*, 907 F.2d 489, 502 (5th Cir. 1990). "The state prosecutor was not suggesting to the jury that the petitioner was obligated to prove his innocence. Rather, he was arguing that the petitioner's . . . testimony was unsupported and not worthy of belief. Thus, the prosecutor's comments did not shift the burden of proof to the defense and did not violate the petitioner's constitutional rights." *March v. Bock*, No. 00-CV-10495, 2003 WL 21488691, at *8 (E.D. Mich. June 12, 2003) (Lawson, J.). Further, any ambiguity that the prosecutor's argument may have created for the jury on the matter of the burden of proof was cured by the trial court's instructions on the proper burden of proof. *See Scott v. Elo*, 302 F.3d 598, 603-04 (6th Cir. 2002); *Lugo v. Kuhlmann*, 68 F. Supp. 2d 347, 369 (S.D.N.Y. 1999). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

G.     *Sentencing (Claim IV)*

Finally, petitioner contends that his sentence was improper because his sentencing guidelines were incorrectly scored and because the sentencing procedure violates *Blakely v. Washington*, 542

U.S. 296 (2004). The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1. *Guidelines Scoring*

A habeas petitioner's claim that the trial court violated state law when sentencing him is not cognizable in habeas corpus proceedings. *See Branan v. Booth*, 861 F.2d 1507, 1508 (11th Cir. 1988); *Haynes v. Butler*, 825 F.2d 921, 924 (5th Cir. 1987). Federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Serra v. Michigan Department of Corrections*, 4 F.3d 1348, 1354 (6th Cir. 1993). Petitioner's claim that the court improperly scored or departed from the guidelines range raises issues of state law that are not cognizable on habeas review. *See Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (Gadola, J.) (claim that sentencing court departed from Michigan sentencing guidelines presents an issue of state law only and is, thus, not cognizable in federal habeas review); *Welch v. Burke*, 49 F. Supp. 2d 992, 1009 (E.D. Mich. 1999) (Cleland, J.) (same); *see also, Branan*, 851 F.2d at 1508 (claim that court misapplied state sentencing guidelines not cognizable on habeas review).

2. <u>*Blakely*</u>

Likewise, to the extent petitioner contends that his sentence violates the rule of *Blakely v. Washington*, 542 U.S. 296 (2004) and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), his claim is without merit. In *Apprendi*, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. In *Blakely*, the Court considered the applicability of *Apprendi* to a state sentencing guidelines scheme similar to the

United States Sentencing Guidelines. The state in that case argued that guidelines findings were not prohibited by *Apprendi* because *Apprendi* prohibited only factual findings at sentencing which increased the statutory maximum penalty to which the defendant was exposed. The Court in *Blakely* rejected this argument and struck down the state guidelines scheme, explaining that:

> the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

*Blakely*, 542 U.S. at 303-04 (citations omitted) (emphasis in original).

Finally, in *United States v. Booker*, 543 U.S. 220 (2005), the Court took the step logically suggested by *Blakely*, concluding that the United States Sentencing Guidelines are unconstitutional under *Apprendi* because they allow federal judges to impose sentences based on facts not found by a jury beyond a reasonable doubt. Two separate majorities formed the Court's decision. Justice Stevens delivered the opinion of the Court on the substantive question of whether the Guidelines are unconstitutional under *Apprendi*. Noting that there was no difference of constitutional significance between the Guidelines and the state guideline system at issue in *Blakely*, *see Booker*, 543 U.S. at 233, and rejecting the government's attempts to distinguish the two, *see id*. at 237-43, the merits majority concluded that the Guidelines violate the Sixth Amendment as interpreted in *Apprendi*. A separate majority joined an opinion authored by Justice Breyer, which contained the Court's decision on the remedial issue. The remedial majority concluded that the appropriate remedy for the constitutional violation was not to strike the Guidelines in their entirety, but to excise two statutory provisions which make the Guidelines mandatory. *See id*. at 245. Thus, under *Booker* the

Guidelines remain advisory, and a federal district judge must consult the Guidelines before imposing sentence, but the judge is not bound to follow the Guidelines.

Petitioner contends that, because the trial court made the necessary findings on the sentencing guidelines, his sentence violates *Blakely* and *Apprendi*. The Court should conclude that petitioner is not entitled to habeas relief on this claim. Michigan law provides for an indeterminate sentencing scheme, unlike the determinate sentencing schemes at issue in *Blakely* and *Booker*. Under Michigan law the defendant is given a sentence with a minimum and a maximum sentence. The maximum sentence is not determined by the trial judge but is set by law. *See People v. Drohan,* 475 Mich. 140, 160-61, 715 N.W.2d 778, 789-90 (2006); *People v. Claypool,* 470 Mich. 715, 730 n.14, 684 N.W.2d 278, 286 n.14 (2004); MICH. COMP. LAWS § 769.8. "[M]ichigan's sentencing guidelines, unlike the Washington guidelines at issue in *Blakely*, create a range within which the trial court must set the minimum sentence." *Drohan,* 475 Mich. at 161, 715 N.W.2d at 790. Under Michigan law, only the minimum sentence must presumptively be set within the appropriate sentencing guidelines range. *See People v. Babcock,* 469 Mich. 247, 255 n.7, 666 N.W.2d 231, 236 n.7 (2003) (discussing MICH. COMP. LAWS § 769.34(2)). Under Michigan law, the trial judge sets the minimum sentence, but can never exceed the maximum sentence. *See Claypool,* 470 Mich. at 730 n.14, 684 N.W.2d at 286 n.14.

*Blakely* is inapplicable here because *Blakely* is concerned only with the *maximum* penalty which is authorized by a jury's findings or a defendant's plea: if some additional factor increases the defendant's penalty beyond that which could be imposed solely on the basis of the jury's findings or the defendant's plea, *Blakely* requires that those facts be found by a jury beyond a reasonable doubt (or be themselves pleaded to by a defendant). As explained above, unlike the

guidelines scheme at issue in *Blakely*, the Michigan sentence guidelines help determine only the minimum portion of a defendant's indeterminate sentence. The maximum is, in every case, the statutory maximum authorized by law. *See Claypool*, 470 Mich. at 730 n.14, 684 N.W.2d at 286 n.14; MICH. COMP. LAWS § 769.8. Petitioner's conviction on the CSC-I charge, therefore, contained all of the factual findings necessary to impose the statutory maximum (life imprisonment) on that charge. *See Drohan*, 475 Mich. at 162, 715 N.W.2d at 790 ("Thus, the trial court's power to impose a sentence is always derived from the jury's verdict, because the 'maximum-minimum' sentence will always fall within the range authorized by the jury's verdict.").

This being the case, petitioner's sentence did not violate *Blakely* even though the trial court made additional factual findings in imposing the minimum term of petitioner's imprisonment, which in this case equated with his maximum term, life imprisonment. The Supreme Court has repeatedly made clear that the *Apprendi* rule is concerned only with the maximum sentence which is authorized by a jury's verdict or a defendant's plea. As the Supreme Court explained in *Harris v. United States*, 536 U.S. 545 (2002):

> *Apprendi* said that any fact extending the defendant's sentence beyond the maximum authorized by the jury's verdict would have been considered an element of an aggravated crime–and thus the domain of the jury–by those who framed the Bill of Rights. The same cannot be said of a fact increasing the mandatory minimum (but not extending the sentence beyond the statutory maximum), for the jury's verdict authorized the judge to impose the minimum with or without the finding.

*Harris*, 536 U.S. at 557. This distinction is important because the only issue under the Sixth Amendment is whether the judge is impinging on the role of the jury. For this reason, the Court explicitly excepted indeterminate sentencing schemes such as Michigan's from its holding in *Blakely*. Rejecting an argument raised by Justice O'Connor in dissent, the Court explained:

> Justice O'Connor argues that, because determinate sentencing schemes

28

involving judicial factfinding entail less judicial discretion than indeterminate schemes, the constitutionality of the latter implies the constitutionality of the former. This argument is flawed on a number of levels. First, the Sixth Amendment by its terms is not a limitation on judicial power, but a reservation of jury power. It limits judicial power only to the extent that the claimed judicial power infringes on the province of the jury. Indeterminate sentencing does not do so. It increases judicial discretion, to be sure, but not at the expense of the jury's traditional function of finding the facts essential to lawful imposition of the penalty. Of course indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion. But the facts do not pertain to whether the defendant has a legal *right* to a lesser sentence–and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned.

*Blakely*, 542 U.S. at 309 (citation omitted).

Under this reasoning, it is clear that Michigan's indeterminate sentencing guideline scheme, under which the maximum is established by statute and only the minimum term is based on judicial factfinding, does not violate the Sixth Amendment. *See Montes v. Trombley*, ___ F.3d ___, ___, 2010 WL 935369, at *6 (6th Cir. Mar. 17, 2010); *Mays v. Trombley*, No. 2:06-CV-14043, 2006 WL 3104656, at *3 (E.D. Mich. Oct. 31, 2006) (Hood, J.); *Worley v. Palmer*, No. 2:06-CV-13467, 2006 WL 2347615, at *2 (E.D. Mich. Aug. 11, 2006) (Cohn, J.); *Drohan*, 475 Mich. at 164, 715 N.W.2d at 791-92; *Claypool*, 470 Mich. at 730 n.14, 684 N.W.2d at 286 n.14. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

H.      *Recommendation Regarding Certificate of Appealability*

1.      *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1). The statute further provides that "[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing

of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further.'"" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by § 2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of

Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2.      *Analysis*

For the reasons explained above, if the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also deny petitioner a certificate of appealability. Because the victim's hearsay statement to Officer Ball was identical to her trial testimony, the Court's conclusion that petitioner has failed to establish prejudice resulting from his counsel's failure to object to this testimony is not reasonably debatable. Likewise, because the Michigan Court of Appeals determined as a matter of state law that Desiree Kato's testimony was admissible and that petitioner was not entitled to a self-defense instruction and because these determinations of state law are binding on this Court, the Court's resolution of petitioner's ineffective assistance of counsel claims related to these two issues is not reasonably debatable. With respect to petitioner's claim that counsel was ineffective for failing to object to his statements to the police and the prosecutor's questioning of him regarding those statements, it is clear under *Fletcher*, *Robinson*, and *Anderson* that petitioner's statements did not violate the *Miranda* rule and that the prosecutor's questioning of petitioner regarding the inconsistencies between his statement and his trial testimony was not improper. Thus, the Court's resolution of this ineffective assistance of counsel claim is not debatable among jurists of reason. Finally, with respect to counsel's failure to compel the police to run DNA tests on petitioner's pants, it is clear that whether the pants contained blood was simply

irrelevant in the case against petitioner, and thus the Court's conclusion that petitioner cannot establish prejudice resulting from his counsel's omission is not reasonably debatable.

With respect to petitioner's right to present a defense claim, the trial transcript confirms that all the matters sought to be introduced by the three witnesses who did not testify was either irrelevant to the charges against petitioner or cumulative of the testimony of both petitioner and the victim. Because these matters were adequately presented to the jury, it is not reasonably debatable that petitioner has failed to show that the absence of these witnesses implicated a fundamental aspect of petitioner's defense. The prosecutor's comments, when viewed in context, properly addressed the credibility of petitioner in light of the inconsistencies of that testimony and petitioner's motive to lie. Thus, it is not reasonably debatable that the prosecutor's comments were proper. Finally, in light of the clear and unanimous authority holding both that guidelines scoring claims are not cognizable on habeas review and that *Blakely* does not apply to Michigan's indeterminate sentencing scheme, the Court's resolution of petitioner's sentencing claims is not reasonably debatable. Accordingly, the Court should conclude that petitioner is not entitled to a certificate of appealability.

I.    *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should also conclude that petitioner is not entitled to a certificate of appealability.

III.    NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation,

but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: 3/25/10

> The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on March 25, 2010.
>
> s/Eddrey Butts
> Case Manager